UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-v.-

PURIFICACION CRISTOBAL,

Defendant.

PURIFICACION CRISTOBAL,

Movant,

-v.-

UNITED STATES OF AMERICA,

Respondent.

20 Cr. 463-1 (KPF)

**OPINION AND ORDER**

25 Civ. 1638 (KPF)

---

KATHERINE POLK FAILLA, District Judge:

Purificacion Cristobal, who is currently housed at the Federal Correctional Institution in Marianna, Florida ("FCI Marianna"), has moved to vacate, set aside, or correct her sentence pursuant to 28 U.S.C. § 2255, claiming that she received ineffective assistance of counsel throughout her prosecution and direct appeal. The Government opposes the motion, and several of Dr. Cristobal's former attorneys have submitted sworn statements refuting her claims. For the reasons set forth in the remainder of this Opinion, the Court denies Dr. Cristobal's motion.

## BACKGROUND[1]

### A.    Factual Background

Dr. Cristobal is a nurse practitioner who operated, and was the sole medical professional at, the Kamehameha Health and Wellness Clinic in the Bronx, New York.  (PSR ¶ 10).  From at least June 2019, until her arrest on July 8, 2020, Dr. Cristobal regularly diverted large quantities of oxycodone to patients without legitimate medical need, without conducting physical examinations, and despite clear signs that many of her patients were drug dealers or drug addicts.  (*Id.* ¶¶ 11-16).

Dr. Cristobal charged certain of her patients for controlled substances on a per-prescription basis, and sometimes withheld prescriptions based on patients' inability to pay, rather than on changed medical circumstances.  (PSR

---

[1]    Unless otherwise indicated, references to docket entries in this Opinion pertain to the docket in the criminal case, *United States* v. *Cristobal*, No. 20 Cr. 463-1 (KPF). The Court refers to Dr. Cristobal's Revised Final Presentence Investigation Report as the "PSR" (Dkt. #206); to the transcript of the July 18, 2022 hearing on her motion to suppress as "July 18, 2022 Tr." (Dkt. #84); to the transcript of the July 21, 2022 oral argument on her motion to suppress as "July 21, 2022 Tr." (Dkt. #86); to the transcript of her trial as "Trial Tr." (Dkt. #155, 157, 159, 161, 163, 165, 167, 169, 171, 173, 175); to the transcript of her January 19, 2023 sentencing hearing as "Sent. Tr." (Dkt. #207); to the opening brief in support of Dr. Cristobal's Section 2255 motion as "Def. Br." (Dkt. #252); to the sworn statements of attorneys Jonathan Rosenberg, Joseph V. Sorrentino, Kristen M. Santillo, Fern Mechlowitz, Samantha Chorny, and S. Michael Musa-Obregon, respectively, as "Rosenberg Aff." (Dkt. #255), "Sorrentino Decl." (Dkt. #260), "Santillo Aff." (Dkt. #262), "Mechlowitz Aff." (Dkt. #263), "Chorny Aff." (Dkt. #265), and "Musa-Obregon Aff." (Dkt. #270); to the Government's brief in opposition to Dr. Cristobal's Section 2255 motion as "Gov't Opp." (Dkt. #273); to Dr. Cristobal's reply submission as "Def. Reply" (Dkt. #278); and to the April 2026 addendum to Dr. Cristobal's submissions as "Def. Add." (25 Civ. 1638 Dkt. #11).  References to Dr. Cristobal's submissions use the pagination provided by this Court's Electronic Case Filing ("ECF") system.

Both this Court and the United States Court of Appeals for the Second Circuit have issued written decisions resolving motions filed by Dr. Cristobal.  *See United States* v. *Cristobal*, No. 20 Cr. 463-1 (KPF), 2025 WL 524166 (S.D.N.Y. Feb. 18, 2025); *United States* v. *Cristobal*, No. 23-6107, 2024 WL 1506750 (2d Cir. Apr. 8, 2024).  The Court adopts the factual findings and procedural histories set forth in each opinion.

¶¶ 16-19).  She also conspired with others to divert oxycodone, including several of the receptionists she employed; Christian Ohaeri, a pharmacist who ran a pharmacy across the street from her clinic; and at least one patient, Justin Campanello, who recruited others to her practice in exchange for medically unnecessary prescriptions.  (*Id.* ¶¶ 20-24).

During the relevant time period, Dr. Cristobal prescribed a combination of oxycodone, alprazolam (known commonly as Xanax), and Adderall for many of her patients, despite Centers for Disease Control and Prevention ("CDC") guidelines cautioning practitioners against prescribing oxycodone and Xanax together.  (PSR ¶¶ 13-14).  Between June 2019 and July 8, 2020, Dr. Cristobal wrote 1,582 oxycodone prescriptions for hundreds of patients.  (*Id.* ¶ 25).  During this same period, Dr. Cristobal wrote 2,305 Xanax prescriptions and 1,077 Adderall prescriptions.  (*Id.*).  On several occasions, Dr. Cristobal prescribed the highest dose in which those drugs were available.  Many of her patients resold their pills after receiving the prescriptions.  (*Id.* ¶¶ 16, 22).

## B.    Procedural Background

### 1.    The Complaint and the Indictment

On July 2, 2020, a sealed complaint was filed charging Dr. Cristobal with conspiracy to distribute and possess with intent to distribute oxycodone, in violation of 21 U.S.C. § 846.  (Dkt. #1).  Dr. Cristobal was arrested on July 8, 2020, presented in this District that same day, and released on bail conditions.  (Dkt. #4-5).  On September 3, 2020, the Grand Jury returned a one-count

indictment charging Dr. Cristobal with the same offense.  (Dkt. #9 (the "Indictment")).

### 2.    Dr. Cristobal's Motion to Suppress

On March 11, 2022, Dr. Cristobal filed a motion to suppress evidence and a motion to dismiss the Indictment.  (Dkt. #52-53).  Her memorandum in support of the motion to suppress began by reciting, among other things, that:

- "Dr. Purificacion Cristobal is a 75-year old nurse practitioner who was running her own clinic, the Kamehameha Health and Wellness Nonprofit Corporation, which provided behavioral care to the underserved community in and around the Bronx";

- "Dr. Cristobal subscribes to the psychiatric model of treating chronic pain, which recognizes that chronic pain can contribute to psychiatric disorders, and therefore effectively treating the pain can alleviate, or even prevent, psychiatric symptoms"; and

- Dr. Cristobal "has been licensed and entrusted to prescribe medication by multiple state and federal authorities, and to use her professional medical judgment in writing prescriptions."

(Dkt. #52-1 at 1-2).  Broadly speaking, Dr. Cristobal argued that the Government had included material misstatements in its application for a search warrant and related materials, while "omit[ting] multiple facts that undermine the integrity of the investigation and any notion that Dr. Cristobal was in a narcotics conspiracy."  (*Id.* at 3).  Separately, Dr. Cristobal conditionally sought dismissal of the Indictment "should the United States Supreme Court decide in *Ruan* v. *United States* that the 'except as authorized' clause in 21 U.S.C. § 841(a)(1) includes a *mens rea* element — *i.e.* that the

physician knowingly and intentionally prescribed drugs beyond what she believed she was authorized to do."  (Dkt. #53 at 1).

The Court held a hearing on Dr. Cristobal's suppression motion on July 18, 2022, at which one of the case agents, former Drug Enforcement Administration ("DEA") Task Force Officer Christos Deftereos, testified at length concerning the Government's investigation and the preparation of the search warrant application.  (July 18, 2022 Tr.).  Three days later, on July 21, 2022, the Court held oral argument on the motion to suppress.  (July 21, 2022 Tr.).  In a telephone conference held on August 10, 2022, the Court denied the motion.  (Dkt. #126 (transcript of oral decision)).  As relevant here, the Court found that

> after reviewing Second Circuit precedent, and after considering Mr. Deftereos'[s] testimony and the hearing exhibits, I don't believe that I can say that his errors amounted to actionable reckless disregard.  And I'll note that even if I were to find reckless disregard, I am ultimately concluding that the putative errors and omissions attributed to Mr. Deftereos were not so material as to warrant suppression.

(*Id.* at 5).[2]

---

[2]    *See also* Dkt. #126 at 16-17:

> The affiant here, Mr. Deftereos, was questioned at length, and I cannot, on this record, conclude that he intentionally misled the relevant judges or that he harbored serious doubts regarding the accuracy of the information that he provided, or that he ignored obvious reasons to doubt the v[e]racity of the statements he made. He was at times sloppy, and in this setting, he should never be, but there were efforts made to be accurate, even if they were not always or completely successful.

### 3.    The S1 Indictment and the Trial

On July 19, 2022, the Government obtained a superseding indictment, S1 20 Cr. 463 (the "S1 Indictment"), charging Dr. Cristobal in eight counts, comprising the earlier narcotics conspiracy count plus seven counts of distribution and possession with the intent to distribute oxycodone, in violation of 21 U.S.C. § 841.  (Dkt. #77).  The Court arraigned Dr. Cristobal on the S1 Indictment after the oral argument on the motion to suppress held on July 21, 2022.  (Minute Entry for July 21, 2022).

Trial on the S1 Indictment began against Dr. Cristobal on August 22, 2022.  (Dkt. #155 (transcript)).  As relevant here, defense counsel's opening echoed several of the themes set forth in Dr. Cristobal's motion to suppress:

> Dr. Cristobal is a Ph.D. in nursing.  She is licensed by both the DEA and the state of New York to prescribe every single drug the government is going to talk about in this case.  She specializes in psychiatry, general family practice and she is also licensed to treat people who have substance abuse and addiction issues.  She believes it's important for her patient's psychological and physical wellbeing that they have appropriate treatment for their pain.  And she believes that when someone has documented proof that the ongoing injury that is debilitating for them and that the affects the quality of their life, that oxycodone can be an appropriate treatment.  It's not like — it's been well recognized that it is effective in treating pain as one option.
>
>                        ***
>
> [Every day Dr. Cristobal] went to work she believed that she was treating her patients with medicine that would help them.  She did not knowingly and intentionally prescribe medicine that she believed would hurt her patients.  She did not knowingly and intentionally prescribe medication that she knew people would abuse

or sell, and she believed that she was acting for a legitimate medical purpose.

(*Id.* at 36-37).

During the trial, the Government called nine witnesses, including cooperating witnesses, former employees of Dr. Cristobal's clinic, and law enforcement officers. One of the Government's cooperating witnesses was Christian Ohaeri, the pharmacist who fulfilled a substantial portion of the controlled substance prescriptions Dr. Cristobal wrote in the face of numerous red flags. The Government also introduced recordings of meetings that Dr. Cristobal had with a confidential informant and with an undercover agent who posed as patients; more than 600 patient files seized from Dr. Cristobal's clinic; and prescription data maintained by the New York State Department of Health's Bureau of Narcotic Enforcement (the "BNE"). (*See* Trial Tr.).

The Government also presented expert testimony from Dr. Christopher Gharibo of the NYU Langone Health System on the subject of pain management. (Trial Tr. 1063-1233). After providing a primer to the jury on different types of pain, Dr. Gharibo discussed "standards of care or guidelines for how a pain management clinician should treat a patient." (*Id.* at 1081). Though Dr. Cristobal had no obligation to present any evidence in her defense, she introduced competing expert testimony on pain management from Dr. Carol Warfield, a professor at Harvard Medical School. (*Id.* at 1426-1506). Dr. Warfield explained that she had reviewed Dr. Cristobal's medical records and certain video recordings of visits to Dr. Cristobal's clinic taken during the underlying investigation, after which she concluded that "Dr. Cristobal was

7

practicing within the usual course of medical practice." (*Id.* at 1433).  As support for her conclusion, Dr. Warfield explained that:

> [Dr. Cristobal] had a doctor-patient relationship with her patients.  She had an intake questionnaire that all the patients filled out with their history.  She looked at the prescription monitoring program records online and I saw that when she didn't find what she wanted there she actually picked up the phone and called the pharmacy with the patient sitting there and then challenged the patient about any questions she had about previous medications after that discussion.  She had pain management agreements which is a good thing to have in the charts.  She did a history on these patients, she ordered MRIs and reviewed the MRIs when appropriate.  She did follow-up on these patients.

(*Id.* at 1433-34).

On September 7, 2022, the jury returned a verdict convicting Dr. Cristobal of Counts One, Six, and Seven of the Indictment — the narcotics conspiracy and two substantive counts — and acquitting her of the other counts.  (Dkt. #147 (verdict form)).  On October 28, 2022, Dr. Cristobal moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33.  (Dkt. #188; *see also* Dkt. #190 (Government opposition to motions)).  Most of Dr. Cristobal's arguments for acquittal concerned the evidence of her intent; by contrast, her arguments for a new trial were predicated on allegations of Government suppression of exculpatory material.  At a telephonic hearing held on January 4, 2023, the Court denied Dr. Cristobal's post-trial motions.  (Dkt. #195 (transcript of oral decision)).

### 4.    The Sentencing

Sentencing for Dr. Cristobal took place on January 19, 2023.  (*See* Sent. Tr.; Dkt. #202 (judgment)).  In anticipation of sentencing, the Probation Office prepared a Presentence Investigation Report that calculated Dr. Cristobal's exposure under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") to be 188 to 235 months' imprisonment.  (PSR ¶¶ 30-40, 80).  It recommended an aggregate term of 120 months' imprisonment.  (PSR, Sentencing Recommendation).  Dr. Cristobal disputed the Probation Office's Guidelines calculation and sought a sentence of probation or home detention. (Dkt. #192, 197).  The Government agreed with the Guidelines calculations of the Probation Office, but sought a non-Guidelines sentence of 144 months' imprisonment.  (Dkt. #194, 198).

The Court began the sentencing proceeding by reviewing the parties' factual and legal disputes and by obtaining clarification regarding certain statements in the sentencing submissions.  (Sent. Tr. 5-33).  Thereafter, counsel for each side was given extended opportunities to make oral sentencing presentations, and Dr. Cristobal was permitted to speak as well.  (*Id.* at 34-72). After taking a recess to consider the parties' arguments, the Court then imposed sentence.  As a first step, the Court resolved the Guidelines disputes in a manner different from those suggested by the parties, making a conservative estimate that only one-third of the oxycodone prescriptions at issue "were prescribed by the defendant ... without a legitimate medical purpose and outside of the usual course of her professional practice."  (*Id.* at

78). The Court declined to impose a "stash house" enhancement, but did impose a four-level leadership role enhancement. (*Id.* at 78-79). The Court's calculations yielded a Guidelines range of 188 to 235 months' imprisonment. (*Id.* at 79). Ultimately, the Court determined to impose concurrent terms of 84 months' imprisonment, citing Dr. Cristobal's age and health conditions. (*Id.* at 79-81).

Dr. Cristobal surrendered to begin serving her sentence on or about April 19, 2023, and her current projected release date is March 20, 2028.

### 5.    The Direct Appeal

Dr. Cristobal appealed from her conviction and sentence. (Dkt. #203 (notice of appeal)). Among other challenges to her conviction, Dr. Cristobal argued that: (i) the Government failed to prove her subjective intent to distribute, or to conspire to distribute, controlled substances without authorization; (ii) the Court erred in permitting Dr. Gharibo to testify regarding the standard of care for doctors prescribing controlled substances in New York; (iii) the Court erred in instructing the jury regarding the subjective intent standard mandated by the Supreme Court's decision in *Ruan* v. *United States*, 597 U.S. 450 (2022); (iv) certain belated disclosures by the Government violated *Brady* v. *Maryland*, 373 U.S. 83 (1963); and (v) the Court erred in calculated the drug quantity attributable to Dr. Cristobal under the Guidelines. *See United States* v. *Cristobal*, No. 23-6107, 2024 WL 1506750, at *1-6 (2d Cir. Apr. 8, 2024) (summary order). On April 8, 2024, the Second Circuit affirmed

Dr. Cristobal's conviction and sentence by summary order.  (Dkt. #229 (mandate)).

### 6.    The Section 3582(c) Motions

In a submission received by the Court on May 30, 2024, Dr. Cristobal moved for a sentence reduction in light of Amendment 821 to the Guidelines, pursuant to 18 U.S.C. § 3582(c)(2).  (Dkt. # 230).  The Court found that Dr. Cristobal was ineligible for a reduction in sentence pursuant to that amendment, and denied her motion by orders dated July 8, 2024.  (Dkt. #235, 236).

Shortly thereafter, Dr. Cristobal filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) that was received by the Court on June 26, 2024.  (Dkt. #231-232).  In light of her failure to exhaust administrative remedies, the Court denied her motion without prejudice to its renewal in an order dated July 8, 2024.  (Dkt. #234).  By letter received July 31, 2024, Dr. Cristobal advised that she had served a copy of her compassionate release motion on the Warden of her facility (Dkt. #237); in a separate letter received on September 10, 2024, she advised the Court that more than 30 days had passed without receiving a response from the Warden (Dkt. #242).  By Order dated February 18, 2025, the Court denied Dr. Cristobal's request for compassionate release, finding both that she had failed to identify an extraordinary and compelling reason for her request and that the factors listed in 18 U.S.C. § 3553(a) counseled against granting her request. (Dkt. #251).

11

### 7.  The Instant Motion

On February 21, 2025, the Court received Dr. Cristobal's Section 2255 motion.  (Dkt. #252).  Because the motion raised claims of ineffective assistance of counsel, the Court issued an order on March 12, 2025, seeking Dr. Cristobal's informed consent to waive the attorney-client privilege.  (Dkt. #253).  Thereafter, the Court issued a scheduling order on April 9, 2025, that included a timetable for the receipt of sworn statements from several of Dr. Cristobal's prior counsel.  (Dkt. #254).  Upon receipt of the sworn statements, the Court ordered a response from the Government.  (Dkt. #271).  The Government's opposition submission was filed on September 15, 2025.  (Dkt. #273).  Dr. Cristobal's reply submission was filed on October 17, 2025.  (Dkt. #278).  In April 2026, Dr. Cristobal filed an addendum to her motion.  (25 Civ. 1638 Dkt. #11).

In her Section 2255 motion, Dr. Cristobal argues that she received the ineffective assistance of counsel at various stages of her prosecution and appeal.  In particular, she claims that:

- Trial counsel failed to obtain the suppression of evidence seized from Dr. Cristobal's home;

- Trial counsel failed to "lay[] the proper foundation for [Dr. Cristobal] being both authorized and registered with the DEA to prescribe Oxycodone";

- Trial failed put forward an expert witness "that caused Dr. Cristobal more harm than good," and should have retained an expert witness who practiced psychiatry;

- Trial counsel "failed to perform an adequate review of evidence that could have been used to impeach [the] government's chief witness," Christian Ohaeri; and

    ▪      Appellate counsel failed to include Dr. Cristobal in discussions of appellate strategy.

(Def. Br. 1-12, 16-22).

## DISCUSSION

### A.    Applicable Law

#### 1.    Motions Under 28 U.S.C. § 2255

A prisoner in federal custody may seek to have her sentence vacated, set aside, or corrected on the grounds that it "was imposed in violation of the Constitution or laws of the United States, or that the [trial] court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]" 28 U.S.C. § 2255(a).[3] However, the grounds for such a collateral attack under Section 2255 are much more limited than those available on a direct appeal. *See United States* v. *Addonizio*, 442 U.S. 178, 185 (1979). Relief may lie "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States* v. *Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill* v. *United States*, 368 U.S. 424, 428 (1962)); *accord Cuoco* v. *United States*, 208 F.3d 27, 30 (2d Cir. 2000).

"It is well established that a § 2255 petition cannot be used to 'relitigate questions which were raised and considered on direct appeal.'" *United States* v. *Sanin*, 252 F.3d 79, 83 (2d Cir. 2001) (quoting *Cabrera* v. *United States*, 972

---

[3]    The case law refers to a person who files a Section 2255 motion alternatively as a "movant," a "petitioner," a "prisoner," or a "defendant."

F.2d 23, 25 (2d Cir. 1992)); *accord United States* v. *Natelli*, 553 F.2d 5, 7 (2d Cir. 1977) ("[O]nce a matter has been decided adversely to a defendant on direct appeal it cannot be relitigated in a collateral attack[.]").  The sole exception is when "there has been an intervening change in the law and the new law would have exonerated a defendant had it been in force before the conviction was affirmed on direct appeal."  *Chin* v. *United States*, 622 F.2d 1090, 1092 (1980).  Section 2255 also precludes a defendant from bringing claims for the first time that could have been raised on direct appeal.  *See Bousley* v. *United States*, 523 U.S. 614, 622-23 (1998).  Where the petitioner has procedurally defaulted on a claim by failing to raise it on direct appeal, the claim may be raised pursuant to Section 2255 only if the petitioner can demonstrate (i) cause for the failure to raise the claim and prejudice from the alleged error, or (ii) actual innocence of the crime.  *Id.*

In resolving a motion under 28 U.S.C. § 2255, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b); *see also, e.g., Pham* v. *United States*, 317 F.3d 178, 185 (2d Cir. 2003) (noting that 28 U.S.C. § 2255 does not permit summary dismissals of motions that present facially valid claims).  That said, the filing of a Section 2255 motion does not automatically entitle the movant to a hearing — as, for example, in instances in which a movant's allegations are "vague, conclusory, or palpably incredible."  *Machibroda* v. *United States*, 368 U.S. 487, 495 (1962).  Rather, it is within the district court's discretion to determine the scope and

nature of a hearing.  *See Chang* v. *United States*, 250 F.3d 79, 85-86 (2d Cir. 2001) ("It was, therefore, within the district court's discretion to choose a middle road [requiring a detailed affidavit from counsel] that avoided the delay, the needless expenditure of judicial resources, the burden on trial counsel and the government, and perhaps the encouragement of other prisoners to make similar baseless claims that would have resulted from a full testimonial hearing."); *cf. Thomas* v. *United States*, 93 F.4th 62, 66 (2d Cir. 2024) ("In many cases, the district court may discharge this obligation by accepting affidavits from the defendant's prior counsel, including those filed as part of the government's opposition papers.").

## 2.    Ineffective Assistance of Counsel Claims

One potential basis for relief under Section 2255 occurs when a defendant has received ineffective assistance of counsel.  A defendant in a criminal proceeding has a right under the Sixth Amendment to effective assistance from her attorney at all critical stages of the proceeding, including trial.  *See, e.g.*, *Lafler* v. *Cooper*, 566 U.S. 156, 165 (2012); *United States* v. *Langhorne*, No. 23-7275-cr, 2025 WL 3171690, at *2 (2d Cir. Nov. 13, 2025) (summary order).

In order to succeed on a claim of ineffective assistance of counsel, a movant must meet the two-pronged test established by *Strickland* v. *Washington*, 466 U.S. 668 (1984).  *First*, the movant must show that her counsel's representation was deficient, falling below the objective standard of reasonableness.  *See id.* at 687-88.  At this first step, the standard of review is

highly deferential and includes "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "This presumption is overcome only if counsel failed to act reasonably considering all of the circumstances." *United States* v. *Rosemond*, 958 F.3d 111, 121 (2d Cir. 2020). A court evaluating arguments of ineffectiveness "must avoid the distorting effects of hindsight and consider the lawyer's perspective at the time the decision was made." *Id.* Moreover, the Second Circuit has made clear that an attorney does not provide ineffective assistance by failing to raise frivolous arguments, even where requested by a client. *See, e.g., Weingarten* v. *United States*, 865 F.3d 48, 53 (2d Cir. 2017).

*Second*, the movant must establish that her counsel's errors resulted in actual prejudice. *See Strickland*, 466 U.S. at 694. A movant satisfies this second prong by proving that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*; *accord United States* v. *Nolan*, 956 F.3d 71, 79 (2d Cir. 2020). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Garner* v. *Lee*, 908 F.3d 845, 862 (2d Cir. 2018); *see also Harrington* v. *Richter*, 562 U.S. 86, 112 (2011) (noting that to demonstrate prejudice under the second prong of the analysis, a defendant must show a "substantial, not just conceivable" "likelihood of a different result").

A variation of the *Strickland* analysis applies to claims of ineffectiveness on the part of appellate counsel. *See Mayo* v. *Henderson*, 13 F.3d 528, 533 (2d Cir. 1994). In this setting, the performance prong requires courts to review

16

whether counsel's conduct met "prevailing professional norms."  *Lynch* v. *Dolce*, 789 F.3d 303, 311 (2d Cir. 2015), *quoted in Purcell* v. *United States*, 158 F.4th 441, 450 (2d Cir. 2025).  A "petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  *Mayo*, 13 F.3d at 533.  Although "counsel has no duty to raise every non-frivolous issue that could be raised," *Lynch*, 789 F.3d at 311, "relief may be warranted when a decision by counsel cannot be justified as a result of some kind of plausible ... strategy," *Jackson* v. *Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998); *but cf. Aparicio* v. *Artuz*, 269 F.3d 78, 100 (2d Cir. 2001) ("Petitioner's appellate counsel was not ineffective for failing to raise the meritless argument.").

## B.    Dr. Cristobal Has Not Demonstrated Ineffective Assistance of Counsel

Before addressing the merits of Dr. Cristobal's claims, the Court offers several preliminary observations.  While Dr. Cristobal has included Joseph V. Sorrentino among the prior counsel against whom she advances ineffectiveness claims, the Court agrees with Mr. Sorrentino that his work was limited to representing Dr. Cristobal at her initial arraignment.  (Sorrentino Decl. ¶¶ 1-8).  Conversely, Jonathan Rosenberg and Samantha Chorny were involved in representing Dr. Cristobal after her trial (Rosenberg Aff.; Chorny Aff.); none of Dr. Cristobal's claims pertains to Ms. Chorny's conduct, and Dr. Cristobal's claims against Mr. Rosenberg for work done on her direct appeal only matter if

17

she has stated a viable claim of ineffective assistance against her trial counsel — which, for the reasons explained herein, she has not.

The Court begins its merits analysis with Dr. Cristobal's challenges to the motion to suppress. As noted above, a comprehensive motion to suppress was filed by Ms. Santillo, Ms. Mechlowitz, and Mr. Musa-Obregon, and was denied by this Court after a lengthy hearing and a separate oral argument. Dr. Cristobal faults her counsel for failing to argue specifically against the seizure of items from her home, and for failing to challenge the use of electronic signatures on the warrant materials. (Def. Br. 17; Def. Add. 2, 5-6). However, the Government's warrant application specifically recited that Dr. Cristobal had been observed by law enforcement officers bringing materials from her clinic into her home, and reasoned from this surveillance that it was likely that Dr. Cristobal's home would contain "evidence, fruits, and instrumentalities" of a narcotics trafficking conspiracy under 21 U.S.C. § 846. (Dkt. #52-5 at 3-6).

Separately, Dr. Cristobal argues that the warrant was invalid because it was not signed. (Def. Br. 16; Def. Add. 2, 5-6). However, as Ms. Santillo has explained, she and her co-counsel "considered this issue, and the signature on the warrant appeared to be an e-signature, which was commonplace during the COVID pandemic, the time-period in which the warrant was signed." (Santillo Aff. ¶ 9). *See* Fed. R. Crim. P. 4.1 (allowing consideration of materials communicated by "telephone or other reliable electronic means" when deciding whether to issue a warrant and in issuing a warrant); Fed. R. Crim. P. 41

18

(detailing procedures for obtaining, issuing, and executing a warrant, including communication by electronic means).[4]

As a second claim of ineffectiveness, Dr. Cristobal argues that her trial counsel failed to lay a proper foundation for her authorizations and ability to prescribe controlled substances, including oxycodone. (Def. Br. 17-19, Def. Reply 1, 3-4; Def. Add. 2).[5] In point of fact, Dr. Cristobal's licensure was specifically addressed at trial: Anthony Logozza from the BNE testified that Dr. Cristobal was licensed by the DEA to prescribe controlled substances, including during the time period charged in the S1 Indictment. (Trial Tr. 980-81, 997). As noted by Ms. Santillo, the parties' expert witnesses also acknowledged Dr. Cristobal's ability to prescribe controlled substances as a nurse practitioner. (Santillo Aff. ¶ 15 (citing Trial Tr. 1176, 1233, 1469)). The jury was fully aware of Dr. Cristobal's ability to prescribe these medications, and the Court instructed jurors that "[t]he law allows a licensed practitioner,

---

[4] To the extent that Dr. Cristobal ascribes ineffectiveness to her counsel's failure to retrieve the electronic devices seized during the search, the Court agrees with the Government that "the warrant authorized the Government to seize the devices and that devices were validly in the Government's possession to ensure their availability for trial, in the event they were needed to authenticate evidence extracted from the devices." (Gov't Opp. 4).

[5] Dr. Cristobal's arguments on this point reiterate challenges presented at trial and on appeal to the sufficiency of the Government's evidence of her intent. (*See, e.g.*, Def. Br. 17 ("Dr. Cristobal was registered and in her mind, mandated to prescribe oxycodone."); Def. Reply 3 ("The Government introduced no evidence that Dr. Cristobal knew her prescriptions were illegitimate. Instead, prosecutors blurred the distinction between a licensed prescriber and a street dealer, collapsing the critical intent element required by *Ruan*[.]")). The Court does not engage with such challenges, given the Second Circuit's finding that sufficient evidence supporting the counts of conviction (including evidence of intent) was presented at trial. *See United States* v. *Cristobal*, No. 23-6107, 2024 WL 1506750, at *3 (2d Cir. Apr. 8, 2024) (summary order) ("Based on this considerable evidence, there is no question that a reasonable jury could have found beyond a reasonable doubt that Cristobal knew that she was unlawfully prescribing oxycodone.").

such as a nurse practitioner, to write prescriptions for controlled substances, such as oxycodone, when the practitioner writes the prescription for a legitimate medical purpose acting within the usual course of the practitioner's professional practice." (Trial Tr. 1713). The jury found, based on the abundant evidence at trial, that Dr. Cristobal violated her professional norms and both unlawfully distributed oxycodone and conspired to do so. *See Cristobal*, 2024 WL 1506750, at *1-3 (detailing evidence at trial). (*See* Dkt. #195 at 7-14 (detailing evidence at trial in oral decision on post-trial motions)).

Dr. Cristobal seeks to analogize her case to *United States* v. *Singh*, 147 F.4th 652 (6th Cir. 2025), where the United States Court of Appeals for the Sixth Circuit reversed a conviction for health care fraud because of an erroneous jury instruction on willfulness that failed to communicate the requirement that the defendant act with knowledge that her conduct was unlawful. *Id.* at 658-59. Putting to the side the fact that this Court is not bound by Sixth Circuit precedent, health care fraud was not charged in the instant case; instead, the narcotics distribution and conspiracy charges in the S1 Indictment required the Government to prove beyond a reasonable doubt that Dr. Cristobal acted "knowingly and intentionally." (*See, e.g.*, Trial Tr. 1715, 1718, 1721, 1724-27). With particular respect to intent, the Court charged the jury that the Government had to prove that Dr. Cristobal knowingly or intentionally "dispensed or distributed, or caused to be distributed and dispensed, oxycodone without a legitimate medical purpose acting outside the usual course of her professional practice." (*Id.* at 1724; *see*

20

*also id.* at 1725 ("The terms 'legitimate medical purpose' and 'usual course of professional practice' mean acting in accordance with a standard of medical practice generally recognized and accepted in the State of New York.")).  The Second Circuit upheld this instruction on appeal.  *Cristobal*, 2024 WL 1506750, at *4.

As a third claim of ineffectiveness, Dr. Cristobal chastises her trial counsel for presenting an expert witness, Dr. Carol Warfield, who "caused Dr. Cristobal more harm than good."  (Def. Br. 7).  In Dr. Cristobal's estimation, counsel should not have retained a pain management expert, but rather an expert witness with a background in psychiatry.  (*See also* Def. Br. 19 ("Dr. Cristobal contends that she should have had an expert who practiced Psychiatry to better explain to the jury the normal protocols of Psychiatry instead of two experts that have the benefit of hindsight making an evaluation that garnered Dr. Cristobal a 84 month[] sentence in a federal prison."); Def. Reply 6, 7; Def. Add. 3).

The Court fails to see how trial counsel's selection or questioning of Dr. Warfield constitutes ineffectiveness.  For starters, the Government presented an expert witness in pain management, Dr. Christopher Gharibo; it was not unreasonable for defense counsel to present a competing witness in the same discipline.  Moreover, Ms. Santillo has detailed the extensive efforts that defense counsel undertook to obtain a useful expert witness.  (Santillo Aff. ¶ 19 ("Leading up to trial, I conducted research into potential experts in psychiatry, and I reached out to several experts in psychiatry as potential experts,

21

including Dr. Barry Roth, Dr. Leonard Weiss, and Dr. George Glass, but they were either not available at the time of trial *or did not provide opinions that I thought would be helpful to Dr. Cristobal.*" (emphasis added)); *see also id.* ¶¶ 18, 20-26).  Finally, in addition to testifying broadly that Dr. Cristobal acted within the requisite standard of care, Dr. Warfield was able to testify meaningfully "regarding how psychiatrists like Dr. Cristobal often prescribe controlled substances without conducting a physical examination," thereby countering some of the most potent portions of Dr. Gharibo's testimony.  (Trial Tr. 1435-36, 1470, 1475-76).  Indeed the Court agrees fully with the Government's assessment of Dr. Warfield's testimony:  "Counsel's chosen expert did not weaken Cristobal's case.  She strengthened it."  (Gov't Opp. 5).

As a fourth claim of ineffectiveness, Dr. Cristobal contends that "[trial] counsel failed to perform an adequate review of evidence that could have been used to impeach the government's chief witness Christian Ohaeri."  (Def. Br. 20; *see also id.* at 21; Def. Reply 5, 6; Def. Add. 3).[6]  To review, Mr. Ohaeri operated a pharmacy close to Dr. Cristobal's clinic.  At trial, Mr. Ohaeri testified that he fulfilled many of the controlled substance prescriptions that Dr. Cristobal wrote, even as he saw that "most of her patients were selling the medications."  (Trial Tr. 822).  Mr. Ohaeri testified to other red flags that he noticed, including the facts that Dr. Cristobal was mostly prescribing controlled

---

[6]     In presenting Dr. Cristobal's argument, the Court is not agreeing with her assessment of Mr. Ohaeri as the Government's "chief witness."  Indeed, the Government had both a confidential informant and an undercover law enforcement officer, each of whom recorded their interactions with Dr. Cristobal.

substances, at high dosages, and mostly for "nonmedical purposes"; Dr. Cristobal wrote controlled substance prescriptions "without even having any information about the patients"; and patients would physically struggle for their prescriptions with non-patients who were looking to consume or sell the pills. (*See, e.g., id.* at 825, 827, 834-40).

As with many cooperating witnesses, Mr. Ohaeri had baggage of his own. At trial, he admitted to fulfilling oxycodone prescriptions that lacked a valid medical purpose, as charged in Count One of the S1 Indictment; indeed, Mr. Ohaeri tacked on additional unnecessary prescriptions for items for which he realized high profit margins. (Trial Tr. 822, 883, 885-86). Mr. Ohaeri admitted lying to law enforcement officers when initially questioned about this case in July 2022. (*Id.* at 879-81). He also admitted to participating in a separate health care fraud scheme with a different doctor, which scheme involved dispensing Suboxone to patients for whom the drug had no medical value and billing insurance companies falsely for these and other false prescriptions. (*Id.* at 883-84). On cross-examination, Mr. Ohaeri admitted to defense counsel that he had been committing health care fraud for some time before he met Dr. Cristobal. (*Id.* at 891-92). Worse yet, Mr. Ohaeri admitted to using Dr. Cristobal's identity to forge prescriptions for non-controlled substances. (*Id.* at 894-908).

Dr. Cristobal complains that she only learned "[m]id-trial," that Mr. Ohaeri had used her identity and credentials to write false prescriptions. (Def. Br. 20). However, as the Second Circuit observed,

23

> the record reflects that materials regarding Ohaeri's cooperation and guilty plea were disclosed in real time as they were generated or shortly thereafter. Moreover, as the government explains (and Cristobal does not dispute), the packet of information that Cristobal describes consisted of additional information regarding Ohaeri's prescription-filling history that defense counsel requested after the start of trial, which the government did not possess at the time but obtained from Ohaeri's counsel and immediately disclosed.

*Cristobal*, 2024 WL 1506750, at *5. Defense counsel had, and made effective use of, the extensive impeachment information concerning Mr. Ohaeri's prior criminal and fraudulent activities. (Santillo Aff. ¶¶ 27-32). Even if Dr. Cristobal could now identify impeachment materials that her counsel lacked at trial, such materials would have been cumulative. *See United States* v. *Persico*, 645 F.3d 85, 111 (2d Cir. 2011) ("[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or is subject to extensive attack by reason of other evidence, the undisclosed evidence may properly be viewed as cumulative, and hence not material, and not worthy of a new trial."), *cited in United States* v. *Londonio*, No. 20-2479-cr, 2024 WL 3770712, at *7 (2d Cir. Aug. 13, 2024) (summary order), *cert. denied*, 145 S. Ct. 2685 (2025).

Dr. Cristobal also claims that a private investigator revealed that Mr. Ohaeri had convictions in Louisiana, Florida, and New York at the time of his trial testimony. (Def. Br. 20; Def. Add. 3). She offers no substantiation for these other convictions, however, and such information is contrary to the comprehensive materials this Court had at the time it sentenced Mr. Ohaeri in August 2025. (Dkt. #274 (Ohaeri judgment)).

24

In her reply submission, Dr. Cristobal offers a hodgepodge of other ineffectiveness allegations, all of which fail.  (Def. Reply 7-9).  These include a "coughing fit" experienced by Ms. Santillo during the trial, which Dr. Cristobal claims left the jury with "the false impression that, Dr. Cristobal, herself was unstable or erratic."  (Def. Reply 7).  This claim borders on the frivolous, and the Court rejects it summarily.

Dr. Cristobal also claims that the Government introduced evidence of prescriptions supposedly written by her in August and September 2020, though she had ceased prescribing on July 8, 2020, the day on which she was arrested.  (Def. Reply 8).  While the Court is unaware of the specific post-arrest prescriptions to which Dr. Cristobal is referring, it notes that the S1 Indictment charged a conspiracy that ended in July 2020, and had as its most recent substantive count a transaction that took place on May 19, 2020, and the jury was instructed on these dates.  (Dkt. #77; Trial Tr. 1707, 1722).[7]

Dr. Cristobal challenges the testimony of Government witness Daniella LoCicero, whose husband used and sold pills provided by Dr. Cristobal and later died from an overdose after leaving her care.  (Def. Reply 8).  Ms. LoCicero was cross-examined fully by defense counsel, and Dr. Cristobal does not suggest any productive lines of inquiry that were omitted by counsel.  (Trial Tr. 762-81).  In a similar vein, Dr. Cristobal challenges the admission of testimony and documents concerning a former patient, Justin Campanello,

---

[7]     Anthony Logozzo testified to two certifications for medical marijuana use, dated August 4, 2020, and September 11, 2020, that were erroneously attributed to Dr. Cristobal and later withdrawn.  (Trial Tr. 975-76).

who resold drugs obtained from Dr. Cristobal and recruited other patients to do the same. (Def. Reply 8). Mr. Campanello was not a witness, but those witnesses who testified to their interactions with him were cross-examined fully. (*See, e.g.*, Trial Tr. 299-300, 31-11 (White); *id.* at 942-43 (Ohaeri)). Perhaps more importantly, defense counsel was able to elicit testimony from these witnesses that Dr. Cristobal discharged Mr. Campanello as a patient for his actions, a fact that only aided the defense case. (*See, e.g., id.* at 406-07).

Finally, Dr. Cristobal declaims her counsel's failure to object to the Government's references to her as a drug dealer. (Def. Reply 7, 9). However, such arguments were permissible on the trial record before the Court. In short, Dr. Cristobal has failed to identify any instance in which she received ineffective assistance from her trial counsel. No such claims can be levied against her trial attorneys, nor can Dr. Cristobal fault her appellate counsel for failing to raise ineffectiveness claims on appeal. To the contrary, as this Court observed firsthand, Dr. Cristobal was well-represented at all stages of her prosecution and appeal.

## CONCLUSION

For the foregoing reasons, the Court DENIES Dr. Cristobal's motion to vacate, set aside, or correct her sentence under 28 U.S.C. § 2255. Because Dr. Cristobal has not made a substantial showing of the denial of a constitutional right with respect to her Section 2255 Motion, the Court will not issue a certificate of appealability. *See* 28 U.S.C. § 2253(c). The Court further certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this Opinion would not be

26

taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge* v. *United States*, 369 U.S. 438, 444-45 (1962).

The Clerk of Court is directed to docket this Opinion in Case Nos. 20 Cr. 463-1 and 25 Civ. 1638; to terminate the motions at docket entries 178 and 252 in Case No. 20 Cr. 463-1; and to close Case No. 25 Civ. 1638.

The Clerk of Court is further directed to mail a copy of this Opinion to Dr. Cristobal at the following address:

> Purificacion Cristobal
> Reg. No. 88061-054
> FCI Marianna
> Federal Correctional Institution
> P.O. Box 7007
> Marianna, FL 32447

SO ORDERED.

Dated:   April 14, 2026
         New York, New York

KATHERINE POLK FAILLA
United States District Judge

27